DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
JAMES M. PEARL (S.B. #198481)
jpearl@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Attorneys for Plaintiffs Wimbledon
Financing Master Fund, Ltd and Stillwater
Market Neutral Fund III SPC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WIMBLEDON FINANCING MASTER FUND, LTD., a Cayman Islands company; STILLWATER MARKET NEUTRAL FUND III SPC, a Cayman Islands company,<br><br>            Plaintiffs,<br><br>    v.<br><br>DAVID MOLNER, an individual; SCREEN CAPITAL INTERNATIONAL, CORP., a Delaware Corporation; ARAMID CAPITAL PARTNERS LLP, a United Kingdom limited liability partnership; ARAMID ENTERTAINMENT FUND LIMITED, a Cayman Islands company,<br><br>            Defendants. | Case No. 2:11-cv-07695-GW-E<br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL FOR:**<br><br>**(I) BREACH OF FIDUCIARY DUTY;**<br><br>**(II) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br><br>**(III) FRAUD;**<br><br>**(IV) BREACH OF CONTRACT;**<br><br>**(V) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;**<br><br>**(VI) UNJUST ENRICHMENT**<br><br><br>Filing Date: October 24, 2011 |

Plaintiffs Wimbledon Financing Master Fund, Ltd. ("Wimbledon"), a
Cayman Islands company; and Stillwater Market Neutral Fund III SPC
("Stillwater"), a Cayman Islands company (collectively, "Plaintiffs"), by their
attorneys, O'Melveny & Myers LLP, bring this Complaint against Defendants
David Molner ("Molner"); Screen Capital International, Corp. ("SCI"); Aramid
Capital Partners, LLP ("Aramid Capital"); and Aramid Entertainment Fund Limited
("AEF")(collectively, "Defendants"), and allege as follows:

### Nature of the Action

1.      This is an action by non-voting investors in AEF, a Cayman Islands
mutual fund established in 2006, to stop the theft of Plaintiffs' investment by the
self-dealing Defendants.  Defendants have essentially frozen Plaintiffs' investments
in AEF as punishment for Plaintiffs' attempt to blow the whistle on Defendants'
fraud and self-dealing.

2.      For the last three years, Defendant Molner deliberately hid from AEF's
auditors that he and the other defendants executed a series of *ultra vires*, insider
transactions designed specifically to siphon funds from AEF shareholders.  Molner
and the other defendants entered into multi-million dollar loan agreements whereby
they used AEF capital to obtain monetary and equitable benefits for themselves—
rather than for the benefit of AEF and its shareholders.

3.      These loans—totaling more than $60 million and half of the current
value of AEF—are currently non-performing or have been written off altogether.
Indeed, all but one of the loans that AEF, acting at the direction of Molner, made to
the insider entities are presently impaired.  To this day, the full extent of Molner's
looting remains unclear as a result of Molner's ongoing refusal to allow an audit,
his refusal to provide proper disclosures, and his active concealment of AEF's true
financial condition.

4.      When various investors complained of Defendants' misconduct,
Defendants agreed to the appointment of an independent director, Christopher

---

1  Borde, to investigate AEF's dealings.  At the same time, Molner isolated Borde by

2  keeping him in the dark and denying him access to records concerning Molner's

3  insider transactions.  For example, when Borde sought to investigate the improper

4  insider transactions that Defendants had engaged in, Molner repeatedly denied

5  Borde access to AEF's books and records.  Defendants went so far as to exclude

6  Borde (an independent director) from several AEF board meetings.

7      5.     Despite investors expressing serious concerns about Molner's looting

8  and self-dealing for multiple years, AEF has continued to refuse to allow a truly

9  independent accounting of their books and records since 2008.  As recently as April

10  25, 2011, Defendants manufactured new excuses to fire the fund's auditors, Ernst &

11  Young, before the firm could complete its 2009 annual report on AEF.  To this day,

12  Ernst & Young has not been able to complete its 2009 audit or an audit for 2010.  If

13  audited, the insiders know their self-dealing will be exposed, as will the true value

14  of the assets.

15      6.     AEF has also rejected demands that its directors—all handpicked by

16  Molner—resign and that AEF be allowed to wind down its business in an orderly

17  fashion.

18      7.     AEF has five classes of stock (A, B, C, D and E), but only the holders

19  of the class A stock are allowed to vote.  Molner dominates the voting shareholders

20  and controls the fund.  Defendant Molner, through Defendant SCI, a corporate

21  entity he wholly owns, controls Defendant Aramid Capital, the owner of all Class A

22  stock.  Molner has used that ownership to control AEF.  The majority of AEF's

23  directors were selected by Molner and each has abdicated his fiduciary

24  responsibilities, thereby allowing Molner to exercise near total control.  On

25  information and belief, the directors have conspired with Molner and abused their

26  positions as AEF's fiduciaries by causing AEF to make over $60 million in loans to

27  entities they control on terms that were advantageous to those entities and grossly

28  unfavorable to AEF.

2

8.     Pursuant to their scheme to secretly and unlawfully convert AEF's assets, Defendants have not undertaken any action on behalf of AEF to collect on insider loans.  Indeed, in some cases, they have even modified or acquiesced in modifying the terms of those loans to make them even more favorable to the directors—at AEF's expense and without any legitimate business reason to support the modifications.  For example, in one restructuring of an insider loan, the guarantees were released for no reason and without any consideration to AEF.

9.     On information and belief, Molner, aware that the value of AEF's assets were deteriorating, continued to cause misleading reporting to investors reflecting falsely that AEF's assets were performing.  Molner dissuaded investors from redeeming their investments in AEF (which they had the right to do under the terms of the investment) by making material misrepresentations about AEF's health.  Less than a year later, AEF suspended redemptions altogether.  At the same time Molner reported to investors that there were no funds to repay them, he nonetheless continued to operate AEF in a self-interested manner to the detriment of AEF in violation of his fiduciary duties and solely for the purpose of benefitting himself and the directors.

10.     On information and belief, Molner diverted value from AEF to himself and his affiliates and depleted AEF's funds and resources by (i) making insider loans that directly resulted in the payment of millions of dollars in further fees to Molner and other insiders; (ii) engaging in insider transaction that benefitted his entities; and (iii) making concessions on insider loans that greatly reduced AEF's rights and returns yet allowed him and the directors to be paid even more excessive fees.  The actions have been taken to benefit only the Class A shareholders and have worked a fraud that uniquely harmed the non-voting shares.

11.     Molner's looting put AEF in such dire financial condition that redemptions were suspended in January 2010 and it was delisted from the Cayman Islands Stock Exchange in March 2010.  Nonetheless, Molner refused, and

3

1  continues to refuse, to relinquish control over AEF or to allow Ernst & Young to

2  audit the fund's books and records.

3      12.    Molner, in an effort to punish Plaintiffs for attempting to stop the

4  looting of the fund, deliberately caused AEF to immediately suspend any and all

5  distributions to Plaintiffs and no other shareholders as a punitive measure for

6  moving to protect their assets and enjoin his fraud and misconduct. Molner and

7  AEF's decision to suspend Plaintiffs' distributions was an unauthorized act

8  designed to deter Plaintiffs from moving forward with this lawsuit and to

9  discourage other AEF investors from joining as additional plaintiffs. It has caused

10  millions of dollars of damages to Plaintiffs. Defendants have also blocked any

11  transfer of Defendants' shares essentially rendering the shares worthless.

12      13.    Plaintiffs are forced to bring this action to minimize the loss of their

13  investments in AEF. Accordingly, Plaintiffs seek compensatory and punitive

14  damages for fraud, compensatory damages for breach of fiduciary duty, breach of

15  the implied covenant of good faith and fair dealing, breach of contract, intentional

16  interference with contractual relations, and unjust enrichment, and injunctive and

17  equitable relief, including but not limited to the appointment of a receiver to take

18  immediate control of AEF.

19                              **Parties**

20  **Plaintiffs**

21      14.    Stillwater Market Neutral Fund III SPC ("Stillwater") is a

22  company organized under the laws of the Cayman Islands, with its principal place

23  of business in the Cayman Islands, and beneficial owner of non-voting shares of

24  AEF.

25      15.    Wimbledon Financing Master Fund, Ltd. ("Wimbledon") is a

26  company organized under the laws of the Cayman Islands, with its principal place

27  of business in the Cayman Islands, and beneficial owner of non-voting shares of

28  AEF.

4

16.    In August 1997, Wimbledon and AEF entered into a contract ("Agreement") whereby Wimbledon made a multi-million dollar investment to purchase non-voting shares in AEF.

17.    Wimbledon's shares in AEF have always been held by Fortis Bank (Cayman) Limited ("Fortis") as the registered owner in the Cayman Islands.

18.    Wimbledon and Fortis entered into a Custodian Agreement ("Custodian Agreement") dated August 29, 2007, whereby either party could terminate the agreement pursuant to Clause 13.1.

19.    On or around November 4, 2010, Wimbledon sought to terminate the Custodian Agreement and transfer the name of the registered owner from Fortis directly to Wimbledon.

20.    On or around November 8, 2010, AEF's Administrator informed Wimbledon that AEF's directors rejected the transfer of the shares to Wimbledon.

21.    Molner and AEF's directors acting at Molner's direction rejected the transfer for the sole purpose of attempting to prevent Wimbledon from exposing and seeking redress for their fraud and other wrongdoing and recovering its assets.  Such a rejection is void as a matter of public policy as its sole purpose is to perpetuate further fraud on the shareholders.

**Defendants**

22.    David Molner, an individual, is, on information and belief, a citizen of the State of California who resides in Beverly Hills, California.

23.    SCI is a corporation organized under the laws of the State of Delaware, with its principal place of business in Los Angeles, California.  David Molner is the sole owner of SCI.

24.    Aramid Capital is a United Kingdom limited liability partnership with its principal place of business in the United Kingdom.  Aramid Capital holds all of the Class A shares of AEF, which are the only voting shares issued by AEF.  Aramid Capital is owned by three entities, including SCI.  Molner

5

1    is the chairman of Aramid Capital and operates Aramid Capital out of his SCI

2    office in Los Angeles, CA.

3        25.    Aramid Entertainment Fund Limited ("AEF") is a company

4    organized under the laws of the Cayman Islands, with its principal place of business

5    in the Cayman Islands.

6    **Jurisdiction and Venue**

7        26.    Molner, who controls AEF through a majority of shares or through his

8    control and domination of the Aramid Capital membership, is a resident of Los

9    Angeles County.

10        27.    The majority of the acts, omissions, and injuries described in this

11    lawsuit, including without limitation Molner's looting of AEF and issuance of

12    below-market loans to insider entities, occurred in Los Angeles, CA.

13        28.    Defendants have also brought multiple lawsuits relating to these

14    transactions in California courts.

15        29.    Molner and SCI operate in Los Angeles, California, and the evidence

16    relating to the punitive actions taken against Plaintiffs and the self-dealing

17    motivating those actions are located in Los Angeles.

18    **Factual Allegations**

19    **AEF's Capitalization and the Offering Memorandum**

20        30.    AEF is a Cayman Islands exempted open-ended investment company

21    established on August 15, 2006.  It has corporate offices in the Cayman Islands and

22    the United Kingdom.  AEF's stated business purpose is to provide short-to-

23    medium-term loans to producers and distributors of film, television and other

24    media, secured by a variety of the borrowers' assets, including: tax credits, physical

25    elements, revenue participation rights, distribution rights, underlying copyrights,

26    derivative rights, sales contracts and other receivables.  AEF has five classes of

27    stock: A, B, C, D and E.  However, only the class A shares are entitled to vote.

28    Class A shares are all held by Aramid Capital, which is in turn owned by just three

6

1    entities, at least one of which is controlled by Molner. Molner is the chairman of

2    Aramid Capital and, as such, is able to and does control Aramid Capital.

3        31.    AEF issued an offering memorandum dated November 16, 2006, for

4    the issuance of certain shares labeled Class B Shares, Class C Shares, Class D

5    Shares and Class E Shares (the "Offering Memorandum").

6        32.    Molner made material misstatements to AEF's investors, including

7    Plaintiffs, regarding AEF's business purpose, ability to carry out its business, and

8    AEF's financial condition. The purpose of the misstatements was to induce the

9    investors to invest in AEF and, once invested, deter the investors from taking action

10    to enforce their rights.

11        33.    Through the Offering Memorandum, Molner promised falsely that

12    AEF would have appropriate staffing to carry out legitimate, commercially

13    reasonable lending activities. Molner never intended that AEF would live up to

14    those promises. Instead, he sought the investors' money for the purpose of self-

15    dealing, engaging in insider transactions, and lending to insiders or their entities at

16    below-market terms while paying themselves or their entities enormous and

17    unjustified fees for "finding" and "negotiating" those transactions.

18        34.    The Offering Memorandum also sets forth certain specific investment

19    guidelines concerning the type and scope of activities in which AEF could engage.

20    In particular, the Offering Memorandum provided that bridge loans were to have

21    durations of approximately 3-6 months, tax-credit loans were generally to have a

22    duration of 18 months, and gap-financing loans were generally to have a duration of

23    12-24 months. The Offering Memorandum also provided that the Fund would seek

24    investments that would earn it an average annual return of 20 percent, with a range

25    of up to 98 percent, while maintaining a relatively low risk profile. Plaintiffs relied

26    on the representations made in the Offering Memorandum when they decided to

27    invest millions into AEF.

28

7

35.    As set forth in the Offering Memorandum, AEF's board of directors was supposed to have sole authority and discretion for all investment-making and asset-allocation decisions. Instead, AEF's board wrongfully abdicated that authority to Molner and Molner-controlled entities. Armed with that authority, Molner, along with other insiders, used AEF to line their own pockets by making loans to insider-controlled entities that contained terms that no reasonable lender would find remotely acceptable.

36.    Molner entered into a series of transactions where he used AEF funds to secure for himself valuable equitable rights from AEF debtors. AEF put up all of the capital and assumed all of the risk in these transactions, yet AEF received little benefit, if any. Such transactions were in clear violation of the investment guidelines set forth in the Offering Memorandum provided to the shareholders of AEF. While no reasonable director would have entered into such transactions, Molner and AEF directors consistently ignored the best interests of AEF.

37.    To mask the nature and impropriety of those transactions, Molner repeatedly and consistently provided the shareholders with a rosy but false picture of the value of AEF's assets throughout 2008-2011. Their misrepresentations included, without limitation, concealing AEF's suffering financial health by refusing to take impairments on loans that were never going to be repaid and refusing to adjust loan portfolio valuations to reflect the many non-performing or under-performing loans. Further, the Defendants caused AEF not to seek the collection of over $60,000,000 in loans owed by insiders and affiliates of insiders. Some of the most egregious insider loans and transactions are described below.

**The Insider Transactions**

38.    Throughout AEF's existence, Molner has used AEF and his control over the board of directors to conduct numerous self-dealing transactions to reap large fees for himself while providing his affiliates with cheap liquidity on terms

8

1  grossly unfair to AEF. Defendants also routinely forgave loans made to entities

2  under their control.

3       39.    Almost all of these loans were made outside of the parameters set forth

4  in AEF's Offering Memorandum.

5       40.    The following transactions were negotiated and executed in Los

6  Angeles, California, and the records related thereto are in the possession of Molner

7  and Molner-related entities in Los Angeles, California.

8       41.    **The Incentive Transaction:** Borde's investigation revealed that in

9  the "Incentive Transaction", Molner caused AEF to provide two related loans

10 totaling approximately $32 million to Incentive Filmed Entertainment ("IFE"),

11 which is partly owned by Molner's SCI, and of which Molner himself was the

12 chairman.

13      42.    Despite the fact that an initial $22 million loan from AEF to IFE was

14 well outside the investment guidelines set forth in AEF's Offering Memorandum,

15 Molner and his affiliates approved it because they—not AEF— received nearly $5

16 million in cash considerations and a considerable amount of equity in IFE as part of

17 the transaction. Even though AEF funds were used to finance the entire loan, AEF

18 received none of the upside.

19      43.    Pursuant to the Incentive Transaction, AEF provided an additional

20 loan of approximately $10 million to Incentive Filmed Entertainment Equity

21 Holding ("IFEEH"), an entity partially owned by Molner's SCI. The combined

22 amount of the IFE and IFEEH loans was $32 million. The loans required that the

23 funds be used for film production and development. The loans were significant

24 departures from AEF's investment guidelines set forth in the Offering

25 Memorandum with respect to, among other things, risk, duration and collateral

26 coverage. The combined loans provided for a nearly four-year maturity, with no

27 requirement for IFE or any of the parties to pay any interest on a current basis. The

28 loans represented 100% financing of the transaction thus making it exceptionally

risky.  Indeed, even a 50% loan in an already extremely risky industry during an

economic upheaval would not have been reasonable.  For all this, SCI put up only a

$2.5 million guarantee, which Defendants directed AEF to later forgive.

44.    Molner also acted for his own personal benefit and to AEF's detriment

by causing IFE to enter into a lucrative management contract with SCI and by

further diverting rights from IFE to his other affiliates.

45.    Molner subsequently caused AEF to restructure both loans on terms

even more favorable to SCI.  Such favorable terms included: (a) the waiver of

guarantees by each of those parties for less than a reasonable equivalent; (b) the

conversion of the payment of interest in cash-equivalent to payment-in-kind

interest; and (c) the suspension of interest accruals.  Thus, after making a below-

market loan contrary to AEF's investment guidelines, the directors, under the

control of Molner, approved a restructuring that rendered the loan even riskier for

AEF (and even more favorable to the insiders).

46.    As best Plaintiffs can determine, neither the IFE nor the IFEEH loans

has been repaid, nor has the board taken any action with respect to the collection of

the loans, notwithstanding that the total balance owed is in excess of $35 million.

The value of this investment is believed to be substantially impaired.

47.    **The Sierra Transaction:**  Borde's investigation revealed that in

December 2009, AEF's board approved a $1 million loan to Sierra Pictures, LLC

("Sierra Pictures").  That loan was funded in April 2010.  At the same time, Sierra

entered into a three-year agreement with IFE (mentioned above), pursuant to which

Sierra Pictures was to act as the exclusive sales agent for IFE and IFE was to source

all theatrical films from Sierra Pictures.  IFE was obligated to pay $1 million a year

to Sierra Pictures, substantial executive producer fees on each film, and profit

participations.  Sierra Pictures' two managers are entitled to salaries up to $1

million each.

FIRST AMENDED COMPLAINT

48.     Sierra Pictures, in turn, granted SCI the exclusive right to: (a) finance
any tax credits, rebates, and other similar government-backed production incentives
for Sierra Pictures-controlled films; (b) exercise a last refusal to finance, or arrange
for the financing of, certain expenses for any Sierra Pictures-controlled film; and (c)
act as the exclusive agent to raise capital for Sierra Pictures. For this, SCI was
entitled to receive a fee equal to 5 percent of any junior capital actually raised, plus
2 percent of any senior debt raised.

49.     Again, AEF was left with an account receivable where the debtor had
no intention of repaying the loan while Molner and SCI gained valuable rights by
giving away AEF shareholders' money.

50.     **The IM Global Transaction:**  Borde's investigation revealed that in
June 2008, AEF provided a $5.0 million term loan and a $1.5 million working
capital loan to Stuart Ford to fund the acquisition of 80 percent of the equity of
International Media Global ("IM Global"). SCI and Ford guaranteed the loan. The
loan is secured by a first lien on IM Global's assets. The transaction provided AEF
with 9.9% of the equity, but provided SCI 25.1% of the equity as a structuring
fee/award. SCI also received an exclusive five-year mandate to represent IM
Global in the sale process, the right to source tax-credit funding opportunities, and a
seat on the IM Global board.

51.     Those exceptionally favorable terms notwithstanding, the loans were
restructured in December 2009. IM Global purchased AEF and SCI's equity for the
aggregate sum of $2.5 million (with SCI receiving $1.793 million), and additionally
made a $1,557,500 payment to AEF. The guarantees by SCI and Ford were
released.

52.     In total, AEF invested $6.5 million to obtain a fraction of the equitable
interests in IM Global that were acquired by SCI, even though AEF took all of the
risk and SCI's guarantee was predictably released by Molner and AEF.

53.    **The Future Capital Partners and SCI Transaction:**  Borde's
investigation revealed that one of AEF's first loans, made in 2007, was for $5
million and was made to Future Capital Partners, one of the owners of Aramid
Capital.  AEF has now been forced to take a provision on the loan as potentially
impaired, meaning that Future Capital Partners is unlikely ever to repay it.  AEF
has never collected on the loan nor has it apparently ever attempted to do so.

54.    In either 2008 or 2009, AEF lent a Molner entity, Defendant SCI, $1.5
million.  In March 2010, AEF took an impairment on the full amount of the loan
without explanation.  The directors, apparently acting at Molner's direction, have
caused AEF not to seek to collect the loan.

55.    Molner has also used AEF in other transactions that deviated from
AEF's investment guidelines.  He has done so to siphon off lucrative fee
arrangements for his company, SCI, or in certain circumstances to obtain upside
equity interests in borrowers for the benefit of SCI, all the while ensuring that AEF
retained the entire credit risk.

56.    **The Key Brand Entertainment Transaction:**  Borde's investigation
revealed that in another transaction, Molner caused AEF to provide tax credit
financing to Key Brand Entertainment, an entity chaired by one of AEF's directors,
Thomas McGrath, in an amount of $1.5 million.  In 2010, Molner caused AEF to
write off the loan in its entirety.  Molner and McGrath had been friends for decades
and, in fact, McGrath had given Molner a position at Viacom early in Molner's
career.

57.    Indeed, Molner has admitted to AEF investors that he distributed funds
to himself, related entities, and AEF directors without any disclosure—and he has
written down loans from AEF that he gave to his business associates and friends.

58.    Molner continuously ignored the obvious conflict of interest when
engaging in these insider transactions on unfavorable terms to AEF and in forgiving

12

1    loan guarantees made by related party entities. In doing so, Molner ignored his

2    fiduciary duty to AEF shareholders to maximize the value of their investments.

3        59.    The transactions detailed above are only the tip of the iceberg. The

4    full extent of the fraudulent transactions remains unknown because AEF investors

5    and auditors alike have been kept in the dark by Molner and the other defendants.

6    **Affirmative Misrepresentations of AEF's Financial Health**

7        60.    Molner caused AEF to take at least two actions that masked the insider

8    transactions and misled shareholders. First, he deliberately created a misleading

9    picture of AEF's liquidity and net asset value to mislead shareholders from taking

10   action to enforce their rights.

11       61.    Molner's efforts to disguise the true financial picture of AEF include

12   the following: when AEF's loan portfolio was to be independently evaluated, a

13   number of loans, including insider loans such as loans under the Incentive

14   Transactions, were withheld from the review process, but were nonetheless

15   included in the total net asset value of the portfolio. Molner made sure there was no

16   adjustment for the non-performance of those loans (including, in numerous

17   instances, insider loans) in valuing the portfolio, thereby causing shareholders to

18   see an inflated net asset value.

19       62.    Molner did not take any impairment or make any valuation adjustment

20   with respect to a number of loans that were in litigation notwithstanding that an

21   independent review of expected future cash flows excluded those loans.

22       63.    On information and belief, Molner and/or AEF directors acting under

23   Molner's direction represented to Grant Thornton, which was working to provide

24   an "independent" valuation of the loan portfolio, and to investors, that AEF would

25   recover in full on each and every loan that was in litigation. In particular, Molner

26   represented that loans to certain entities would be recovered in full notwithstanding

27   that the debtors were in bankruptcy. Of course, when those representations were

28   made, there was no likelihood that they would or could be paid in full.

64.    Molner's *modus operandi* is to use AEF investor funds to pay professionals, including but not limited to Grant Thornton, Salter Group, and Tenon Group, to present inflated valuations of AEF based on these groups' 1) cursory review of an incomplete picture of the true state of AEF financial affairs; and 2) reliance on affirmative misrepresentations by Molner and directors acting under his direction.  These professionals' "reports" are littered with assumptions based on affirmative misrepresentations made by Molner and directors acting under his direction and qualifications that their findings are based on the limited financial records Defendants allowed them to review.  To this day, Defendants have refused to allow a completely objective—and comprehensive—review of AEF's books and records.  Ernst & Young attempted such a review but has been stifled and prevented by Defendants from completing its 2009 audit or an audit for 2010.

**The Misconduct is Ongoing**

65.    For the last three years, the Molner repeatedly used his influence and authority to cause AEF to overstate the net asset value of the loan portfolio, and AEF misleadingly told shareholders that the non-performance of certain single-picture loans to non-insiders caused the devaluation of the loan portfolio and the liquidity problems.

66.    Shareholders have repeatedly expressed deep concerns to AEF's directors and Molner with respect to certain aspects of the loan portfolio's net asset value and with respect to conflicts of interest and insider transactions.

67.    In response, Molner has assured such investors that the non-performing or under-performing loans were a small part of the loan portfolio and that the recently reported net asset value of AEF was accurate.  This was deliberately and grossly misleading.

68.    On March 8, 2010, various shareholders wrote to AEF's directors reiterating their concerns and seeking remedial action.  In particular, the shareholders sought an explanation of recent valuations of the loan portfolio and the

14

failure to take impairments on any of the loans in litigation.  The shareholders
further expressed concern regarding the self-dealing transactions described above.
Finally, the shareholders expressed concern with respect to the equal and fair
treatment of all shareholders, including those seeking redemptions and those not
seeking redemptions.

69.    Pursuant to the March 8, 2010 letter, the shareholders sought
appointment of another independent director, the resignation of all non-independent
directors, and an immediate orderly wind down of AEF across all shares.

70.    The March 8th letter resulted from the frustration the investors had
expressed to Molner and AEF's directors in the preceding months to no effect.  The
directors responded by letter dated March 19, 2010, declining to wind down the
fund and declining the request that non-independent directors resign, but agreeing
to allow the appointment of an independent director.  The letter ignored the write-
off of the loan to SCI and failed to address the escalating receivables pursuant to
certain insider loans.

71.    Christopher Borde was chosen as the independent director to conduct
an independent review of AEF's books and records to uncover the full extent of the
insider transactions.  Molner and the directors, seeking to keep the insider
transactions under wraps, refused to cooperate with Borde's review, and instead
sought to hide material information from Borde.  Borde said he was provided
access only to a limited number of documents and Defendants refused to give him
access to complete accounting records, documentation of insider loans, and loan
performance of all AEF transactions.

72.    Molner, though not officially a director of AEF, individually wrote to
the shareholders on April 7, 2010, discussing the need for a write-down of the net
asset value of the loan portfolio as a whole.  He also used the letter to blame all
AEF's impairments on certain disputed loans, while failing to mention the

15

outstanding receivables associated with the insider transactions.  The letter was false.

73.    On April 29, 2011, Defendants distributed a Quarterly Report on behalf of AEF for the period ending March 31, 2011.  In the Quarterly Report, Defendants stated that Ernst & Young's "ongoing" audit of AEF's 2009 books might be suspended for a myriad of baseless reasons.  Defendants listed Ernst & Young as AEF's auditors in the Information Memorandum used to solicit investments in AEF.  Now that the investors have given AEF millions and millions of dollars, Defendants suggest they may start the 2009 audit from scratch and hire a new accounting company instead of allowing Ernst & Young to finish the job they were hired to do.  Knowing a proper audit of AEF's books would show the full extent of Molner's fraud and misconduct, AEF continues to refuse to allow a thorough, independent investigation into their books and records.

74.    In an effort to further delay the completion of the 2009 audit, Defendants refuse to allow Ernst & Young to speak with Borde—the independent director who, when provided access to only a portion of AEF's books and records, uncovered a multitude of illicit, insider transactions executed by Defendants.

75.    The board of directors also declined a request to remove non-independent directors and to remedy the conflicts of interest pervasive in and among AEF's controlling parties.

76.    On July 11, 2011, the fund suspended any and all distributions to Plaintiffs.  Such a suspension is improper, unjustified and not provided for under the bylaws.

77.    Consequently, Plaintiffs seek damages from Defendants for breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, fraud, breach of contract, intentional interference with contractual relations, and unjust enrichment.  Plaintiffs additionally seek injunctive relief preventing Defendants from dissipating assets through a sale or other transfer, from entering into

16

1    transactions with any insider, and compelling distributions of dividends to

2    Plaintiffs.

3

4

5                              **FIRST CAUSE OF ACTION**

6    **(Breach of Fiduciary Duty Against Aramid Capital, Molner, and SCI)**

7            78.     Plaintiffs repeat and reallege all of the allegations contained in this

8    Complaint.

9            79.     Aramid Capital owns a majority of the voting shares of AEF and is

10   thus the controlling shareholder of AEF.  Molner, through SCI, controls Aramid

11   Capital.

12           80.     As the controlling shareholder of AEF, Aramid Capital and, through

13   their control of Aramid Capital, SCI and Molner, owe a fiduciary duty to minority

14   shareholders, including Plaintiffs, under California law.

15           81.     Aramid Capital, Molner, and SCI breached this fiduciary duty when

16   they acted in bad faith to cause AEF to suspend distributions to Plaintiffs for no

17   legitimate reason.

18           82.     Aramid Capital, Molner, and SCI also breached this fiduciary duty

19   when they caused AEF to wrongly refuse to allow the transfer of Plaintiffs' shares

20   from the record shareholder (Fortis) back to Plaintiffs, the beneficial shareholders,

21   making Plaintiffs' shares illiquid.

22           83.     Aramid Capital, Molner, and SCI caused AEF to reject the transfer for

23   the sole purpose of attempting to prevent Wimbledon from exposing and seeking

24   redress for their fraud and other wrongdoing and recovering its assets.

25           84.     Aramid Capital, Molner, and SCI used their power as the controlling

26   shareholder for their personal advantage to the detriment of Plaintiffs.

27           85.     Plaintiffs have suffered damages as a result of AEF's breach.

28

                                            17

## SECOND CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing Against AEF)

86.    Plaintiffs repeat and reallege all of the allegations contained in this Complaint.

87.    Plaintiffs entered into a contractual relationship with AEF when they agreed to invest millions of dollars in AEF and became shareholders of AEF. When Plaintiffs entered into the contract with AEF, they relied on AEF's representations regarding the fund's business purpose and investment guidelines.

88.    Plaintiffs have performed all their obligations under the contract with AEF.

89.    By allowing Molner to misappropriate and loot investor funds and by suspending all distributions to Plaintiffs in bad faith, AEF has unfairly prevented Plaintiffs from receiving the benefits under the contract.

90.    AEF's conduct has resulted in damages to the Plaintiffs.

91.    Accordingly, Plaintiffs seek damages from AEF.


## THIRD CAUSE OF ACTION

### (Fraud Against All Defendants)

92.    Plaintiffs repeat and reallege all of the allegations contained in this Complaint.

93.    As further described in this Complaint, Defendants made statements in the Offering Memorandum regarding AEF's business purpose and guidelines, intending for Plaintiffs to rely on them in making their investment, while never intending to use the investments for such business purposes.

94.    As further described in this Complaint, Defendants took actions to conceal the fact that AEF would not be able to meet its business purpose as stated

18

1  in the Offering Memorandum, and took actions to conceal the fact that AEF would

2  make loans to insiders on terms that were not arms-length and fair to AEF.

3      95.    As further described in this Complaint, Defendants took actions and

4  made statements to conceal the nature, extent and consequences of the insider

5  transactions and the value of the loan portfolio from Plaintiffs and other

6  shareholders.

7      96.    In doing so, Defendants made untrue statements of material fact and

8  omitted to state material facts necessary in order to make the statements not

9  misleading in light of the circumstances under which they were made.

10      97.    Defendants made these statements with knowledge of their falsity,

11  with knowledge that facts omitted were material, and with reckless disregard as to

12  their falsity.

13      98.    Defendants made these statements with the intent that Plaintiffs would

14  rely on them to their detriment and Plaintiffs did justifiably rely on them in 1)

15  making their initial investments in AEF and 2) not exercising their rights to

16  redemptions before Defendants suspended the redemptions altogether.

17      99.    Because Plaintiffs were misled, AEF continued to lose value to the

18  insiders and Plaintiffs' investments were unjustifiably harmed.

19      100.   As a result of the fraud of Defendants, Plaintiffs have suffered

20  damages.

21      101.   Defendants have acted with fraud, malice or oppression entitling

22  Plaintiffs to an award of punitive damages.

23      102.   Accordingly, Plaintiffs seek damages from Defendants.

24  **FOURTH CAUSE OF ACTION**

25  **(Breach of Contract Against AEF)**

26      103.   Plaintiffs repeat and reallege all of the allegations contained in this

27  Complaint.

28

19

104.    Plaintiffs entered into a contractual relationship with AEF when they agreed to invest millions of dollars in AEF and became shareholders of AEF. When Plaintiffs entered into the contract with AEF, they relied on AEF's representations regarding the fund's business purpose and investment guidelines.

105.    Plaintiffs have performed all their obligations under the contract with AEF.

106.    By allowing Molner to misappropriate investor funds and enter into self-dealing transactions outside of the investment guidelines and business purposes provided in the shareholder contracts, AEF has breached its contracts with Plaintiffs.

107.    AEF's breach has resulted in damages to Plaintiffs.

108.    Accordingly, Plaintiffs seek damages from AEF.

## FIFTH CAUSE OF ACTION

### (Intentional Interference With Contractual Relations Against Aramid Capital, Molner, and SCI)

109.    Plaintiffs repeat and reallege all of the allegations contained in this Complaint.

110.    Plaintiffs entered into a contractual relationship with AEF when they agreed to invest millions of dollars in AEF and became shareholders of AEF. When Plaintiffs entered into the contract with AEF, they relied on AEF's representations regarding the fund's business purpose and investment guidelines.

111.    Molner knew about Plaintiff's valid and existing contract with AEF, and about the representations made to Plaintiffs in that contract.

112.    Molner intended to induce AEF to breach its contract with Plaintiffs by using investor funds and entering into self-dealing transactions outside of the investment guidelines.

113.    Plaintiffs have suffered damages as a result of AEF's breach.

20

# SIXTH CAUSE OF ACTION

## (Unjust Enrichment Against Aramid Capital, Molner, and SCI)

114.   Plaintiffs repeat and reallege all of the allegations contained in this Complaint.

115.   Aramid Capital, Molner, and SCI have had and continue to have a benefit conferred on them through the insider transactions in which they wrongfully engaged to the detriment of Plaintiffs.

116.   The above Defendants are aware that they have received such benefits.

117.   It would be unjust to allow the above Defendants to retain the monetary benefits that they have realized through their wrongful conduct, as set forth above.

118.   Accordingly, Plaintiffs seek damages from the above Defendants in an amount by which those Defendants have been unjustly enriched.

# PRAYER FOR RELIEF

119.   WHEREFORE, Plaintiffs respectfully seek Judgment:

120.   Granting a preliminary and permanent injunction compelling Defendants to make distributions owed to Plaintiffs;

121.   Granting a preliminary and permanent injunction allowing the free transfer of Plaintiffs' shares;

122.   Awarding damages against Defendants as the court determines are due and owing, but in an amount not less than $60 million;

123.   Granting a preliminary and permanent injunction preventing Molner and the Defendants from transferring or selling assets and conducting transactions business on behalf of AEF;

21

124. Granting a preliminary and permanent injunction preventing Molner and the Defendants from using AEF investors' funds to defend themselves in this lawsuit;

125. Awarding punitive and exemplary relief sufficient to punish Defendants and deter such conduct;

126. Awarding costs and attorneys fees;

127. Appointing of a receiver to take immediate control of all AEF assets and manage all transactions; and

128. Awarding such other relief as is fair and equitable, including an accounting of AEF's books and records.


Dated: October 24, 2011

DANIEL M. PETROCELLI
JAMES M. PEARL
O'MELVENY & MYERS LLP

By:

James M. Pearl

Attorneys for Plaintiffs Wimbledon Financing Master Fund, Ltd.; Stillwater Market Neutral Fund III SPC

22

## DEMAND FOR A JURY TRIAL

Plaintiffs Wimbledon Financing Master Fund, Ltd. and Stillwater Martket Neutral Fund III SPC hereby demand a trial by jury of any issue triable of right by a jury in this action.

Dated: October 24, 2011

DANIEL M. PETROCELLI
JAMES M. PEARL
O'MELVENY & MYERS LLP

By: _____
    James M. Pearl

Attorneys for Plaintiffs Wimbledon
Financing Master Fund, Ltd.; Stillwater
Market Neutral Fund III SPC

23

<u>**PROOF OF SERVICE BY U.S. MAIL**</u>

I am over the age of eighteen years and not a party to the within action. I am a resident of or employed in the county where the service described below occurred. My business address is 1999 Avenue of the Stars, 7th Floor, Los Angeles, California 90067-6035. I am readily familiar with this firm's practice for collection and processing of correspondence for mailing with the United States Postal Service. In the ordinary course of business, correspondence collected from me would be processed on the same day, with postage thereon fully prepaid and placed for deposit that day with the United States Postal Service. On October 24, 2011, I served the following:

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL FOR:**

**(I)      BREACH OF FIDUCIARY DUTY;**

**(II)     BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**

**(III)    FRAUD;**

**(IV)    BREACH OF CONTRACT;**

**(V)     INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; AND**

**(VI)    UNJUST ENRICHMENT**

by placing a true and correct copy thereof in a sealed envelope with postage fully prepaid and placing the envelope for collection and mailing on October 24, 2011 with the United States Postal Service in accordance with the firm's ordinary business practices, addressed as follows on the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on October 24, 2011, at Los Angeles, California.

Julia M. Banks

PROOF OF SERVICE

1

## SERVICE LIST

2

Steven M. Goldsobel

3

Law Office of Steven M. Goldsobel

1900 Avenue of the Stars, Suite 1800

4

Los Angeles, CA 90067

5

steve@sgoldsobel.com

**Attorney for Nominal Defendant**

6

**Aramid Entertainment Fund Limited**

7

Francisca Mok

8

Reed Smith LLP

1901 Avenue of the Stars, Suite 700

9

Los Angeles, CA 90067

10

fmok@reedsmith.com

**Attorneys for Defendants David Bree and**

11

**Roger H. Hanson**

12

Daniel A. Rozansky

13

Stroock & Stroock & Lavan LLP

2029 Century Park East

14

Los Angeles, CA 90067

15

drozansky@stroock.com

**Attorneys for Defendants David Molner,**

16

**Screen Capital International, Inc., and**

**Aramid Capital Partners LLP**

17

18

Charles E. Weir

McDermott Will & Emery

19

2049 Century Park East, 38th Floor

Los Angeles, CA 90067-3218

20

cweir@mwe.com

21

**Attorneys for Timothy Levy, Thomas**

**Adamek, Future Capital Partners, and**

22

**Stonehenge Capital Company LLC**

23

George E. Pence

24

Kendall Brill & Klieger LLP

10100 Santa Monica Boulevard, Suite 1725

25

Los Angeles, California 90067

26

gpence@kbkfirm.com

**Attorneys for Thomas McGrath**

27

28

SERVICE LIST